Jamison v. Miller.

---

JAMISON and others, appellants, and MILLER, respondent.

1. An unwritten contract for the conveyance of lands, made between a debtor, who has only an equitable estate in the lands, and a third person, who, under the contract, is put in possession of the lands by the debtor, with consent of the owner of the legal estate, will give to the third person

Jamison *v.* Miller.

equitable rights superior to those of the debtor's subsequently attaching creditors.

2. The attaching creditors of a merely equitable owner, cannot set up claims which, at the time of the attachment, it would have been inequitable for him to advance.

3. An express trust, although by parol only, may prevent a resulting trust.

4. An express trust actually created before the issuing of an attachment against the trustee, may be lawfully declared by him afterwards, so as to defeat the attaching creditors.

5. An express trust may be lawfully manifested by an answer in chancery, though, in that regard, not responsive to the bill; but in such case the fact of the trust must be proved against the complainant, *aliunde*.

Appeal from a decree of the Court of Chancery. The case is reported in 11 *C. E. Green* 404.

*Mr. Kingman* and *Mr. Cortlandt Parker*, for appellants.

*Mr. P. L. Voorhees*, for respondent.

The opinion of the court was delivered by
DIXON, J.

On March 18th, 1865, Henry Tilge, being the owner of a cottage at Cape May, conveyed it to James S. Dungan. The purchase money, $5800, was paid by Charles B. Dungan, the father of the grantee. At that time Charles B. Dungan was indebted to the complainant, Waters B. Miller, and to others, and on September 2d, 1865, one of his creditors sued out against him, from the Supreme Court, a foreign attachment, under which, on September 13th, this cottage was attached as his property. Afterwards the complainant came in as a creditor under this attachment, and upon judgment rendered in the cause, June Term, 1868, this cottage was sold to the complainant by the auditors, May 15th, 1869. On November 6th, 1865, James S. Dungan conveyed the cottage to Harriet Jamison, and on September 27th, 1870, Mrs. Jamison mortgaged it to Mary A. Scattergood for $2500. Mrs. Jamison and Mrs. Scattergood both had actual notice of the

attachment at the time it was levied. The bill of complaint alleges that James was trustee for his father, Charles; that by the attachment and sale the complainant got the beneficial title to the premises; that the claims of Mrs. Jamison and Mrs. Scattergood are clouds upon his title; and he prays that his title may be decreed to be good, and that Mrs. Jamison's deed from James and her mortgage to Mrs. Scattergood may be decreed to confer no title on either.

The first objection interposed to this claim is, that upon the complainant's own showing, the interest of Charles in the cottage was merely equitable, and therefore not subject to attachment under our law, and hence that the complainant has acquired no rights whatever to the property. That the facts already stated do show merely an equitable interest in Charles, is clear: He had not, by virtue of these facts, any legal estate. They would constitute him, at most, *cestui que trust*, for whom, at the time of the levy, James was trustee. Whether this fact forms a sufficient legal objection to the attachment of Charles' interest in the land, may be regarded as a question not yet well settled in this state, but the conclusion reached by the court upon other points renders its decision, at present, unnecessary.

Conceding, for the purposes of this case, that the writ of attachment seized upon whatever equitable rights Charles had in the Cape May cottage, it still would remain to be determined whether, at the time of the levy, he had any as against Mrs. Jamison.

The pleadings and testimony, in my judgment, establish the following additional facts: that Mrs. Jamison had, before 1865, occupied the cottage as a summer residence, and had, therefore, become desirous of buying it; that early in that year, she requested her brother-in-law, Duncan White, to negotiate with Mr. Tilge, the owner, for its purchase; that Mr. White did so, and learned that the price was $6000; that meeting Mr. Charles B. Dungan, Mrs. Jamison's brother, and knowing him to be acquainted with Mr. Tilge, he informed Mr. Dungan of Mrs. Jamison's desire, and asked

whether he could not probably negotiate the purchase for her on better terms; that Mr. Dungan was then indebted to Mrs. Jamison to the amount of over $12,000, and replied to Mr. White that he wanted to pay Mrs. Jamison, and he would purchase the cottage for her; that an understanding was then reached between Mr. Dungan and Mrs. Jamison that he should purchase the cottage for her, and should pay for it, and should be credited with the amount paid, upon his indebtedness to her; that accordingly he bought the cottage for $5800, which he paid, and took title in his son James, and at once wrote to Mrs. Jamison that he had closed the bargain; what the terms were; that the cottage was hers, and she might go and do as she pleased with it; that accordingly she went into the actual occupancy of it, repaired it, and treated it in all things as her own; that credit was immediately given by her to Charles, on her book, for the $5800; that before the attachment was issued, and while Charles B. Dungan was on a visit to Mrs. Jamison, at the cottage, she surrendered to Charles certain stocks, &c., which she had held as collateral security for his indebtedness to her; that she did not learn that the legal title was not in herself until the attachment levied on the cottage, which she was then occupying, roused her to inquiry; that on ascertaining where the legal title was, she at once insisted on its conveyance to herself; that James S. Dungan had, from the first, known that his father had bought the cottage for Mrs. Jamison, had, all along, regarded himself as holding it for her, and accordingly, at her request, and with his father's consent, on November 6th, 1865, made a deed of it to her, which she forthwith placed on record; and that Mrs. Jamison has ever since dealt with and regarded the property as her own. The Chancellor was not satisfied of these facts. Some circumstances led him to the conclusion that the transaction was fraudulent—designed to cover up the property of Charles B. Dungan from his creditors. The reason for placing the title in the name of James, is indeed not very obvious, but I think it arose from some desire on the part of Charles and

James to have Mrs. Jamison loan James $2500, by executing and negotiating a mortgage on the cottage for that sum, and they considered it preferable that James should make such mortgage rather than Mrs. Jamison. Of this purpose Mrs. Jamison was not apprised, or, if apprised, she discountenanced it, and communication with her on the subject did not go so far as to inform her that James had the title. She believed she had it. The evidence does not leave me in any doubt of the good faith of Mrs. Jamison. To doubt it, the honesty, under oath, of herself, Mrs. Scattergood, Mr. White, Charles and James Dungan, must be impugned, and I think the inherent probabilities of the case must be disregarded, and that, too, on some circumstances which, at most, engender only suspicious inquiry. Accepting, then, these facts as established, had Charles Dungan any equitable rights in the cottage, as against Mrs. Jamison, when the attachment issued ? I think clearly he had not. These facts, viewed in more than one aspect, make this plain. Admitting that his creditors have the right to insist that, as against James, there was a resulting trust in the land to Charles, because he had paid the purchase money, yet, under the facts, Charles held his trust estate and James his legal estate, subject to the agreement between Charles and Mrs. Jamison that she should have the whole estate, legal and equitable, for $5800 of credit, which she was to give Charles on account. This agreement, if in writing, would have been specifically enforceable by her against them both. And when, under Charles' direction, she took possession of the cottage, and improved it as her own, and gave credit for the $5800, and surrendered the collaterals, she had become equally entitled to its enforcement by the part performance. Her possession had every element necessary to give her an equitable right to complete performance : it was notorious, exclusive ; it embraced the whole property ; it was taken in pursuance of the contract, with the knowledge of both James and Charles, and has been so retained ever since. *Browne on Statute of Frauds,* (3d ed.,) 460–468, and cases cited.

This equitable claim was complete before the writ of attachment issued, and has since, by James' conveyance, been fortified by the legal title, while the complainant's claim has, at best, remained only equitable. A court of equity will certainly not disturb a combined legal and equitable title, for the purpose of aiding a later equity.

Again, when Charles obtained from Mrs. Jamison the stocks she had held as collaterals, he knew that she was surrendering to him those stocks because she had been induced by him to believe that she was the absolute owner of the cottage, and in possession as such. Now to aid him or any one who merely stands in his shoes, to oust her from that possession, without the restoration of those stocks, or the payment of the debt they secured, would be to assist in the perpetration of a plain fraud. Neither he nor those who claim under him, can be allowed, in a court of equity, and without restitution to her, to say that he induced her to believe a lie.

Again, the facts show that there was no resulting trust in favor of Charles Dungan, arising from his payment of the purchase money. Such a trust results only because it is presumed to be accordant with the intention of the parties. Where the evidence clearly shows that such was not their intention, the trust does not exist, and such evidence may be by parol. "An express trust, although by parol only, will prevent the resulting trust; because resulting trusts are left by the statute of frauds and perjuries as they were before; and previously to the act, a bare declaration by parol, would prevent any resulting trust. Besides, an equitable presumption may be rebutted by parol evidence, for, as Lord Mansfield has observed, an equitable presumption is only a kind of arbitrary implication, raised to stand until some reasonable proof brought to the contrary. Therefore, parol evidence will be admitted to prove the purchaser's intention." *Sugd. on Vend. and Pur.* *911.

Now here the intention of Charles was, not that he himself should have the estate, but that Mrs. Jamison should have it. There was an express trust in her favor, and that prevented any resulting trust inconsistent with that express trust. Doubt-

less, if the express trust had been one which he had no right to create against creditors, they might insist on its being disregarded, and on having enforced the trust which, in its absence, would result. But as against creditors, Charles had a right to discharge his debt to Mrs. Jamison, either by actually paying it in cash or by creating an express trust in her favor. Such a trust he did create by buying the cottage, under the arrangement with Mrs. Jamison, and vesting the legal title in James and directing him to hold it for Mrs. Jamison, and directing her to take possession and use it as her own.

And lastly, the express trust in favor of Mrs. Jamison is itself established according to the statute, which requires that it should be manifested by writing, signed by the party enabled to declare the trust. The case develops abundant written evidence of its existence. The parties able to create the trust were Charles and James Dungan, in whom, except for this trust, the whole legal and equitable estate vested at the time this trust was created. Charles, under whom the complainant claims, declared the trust in his letter to Mrs. Jamison, before the complainant's alleged rights attached. Since that time, James has evidenced the trust by executing it; and Charles and James have both united in a manifestation of it by their joint answer in this cause. The fact that these later writings were signed after the complainant's claims intervened, does not rob them of their efficacy under the statute. The writings are but evidence; the trust is anterior and independent; and the rights which the court regards are those that spring from the creation, not the mere proof of the trust. There is no inequity in permitting the trustee of an express trust to make evidence upon which the courts can recognize and effectuate it, in order that the expectations of his creditors, who attempt to enforce their remedies against the trust estate, may be disappointed. In *Gardner* v. *Rowe*, 2 *S. & S.* 346, Wilkinson, after he had committed an act of bankruptcy, executed a declaration of trust in favor of Rowe. His assignees in bankruptcy claimed the estate, insisting that after bankruptcy, he could not declare the trust. On an issue ordered, the jury found that the trust

Jamison *v.* Miller.

existed before the bankruptcy, and thereupon, Vice-Chancellor Leach held the declaration valid and dismissed the bill. On appeal, Lord Chancellor Eldon affirmed this decree. *S. C.,* 5 *Russ.* 258.

Some expressions in the case of *Hutchinson* v. *Tindall,* 2 *Green's Ch.* 357, may seem to give color to the idea that an answer in chancery cannot be regarded as a sufficient declaration of trust under the statute, unless such declaration be responsive to the bill. But the true interpretation of the decision is, that as against a complainant who claimed a title superior to that of the defendant and his alleged *cestuis que trust,* such an answer would not *prove* the trust. If the *fact* of the trust be proved by evidence competent to establish it against the complainant, I see no reason, either in principle or the authorities, to doubt that an answer signed would be a sufficient manifestation of the trust to satisfy the statute, whether responsive to the bill or not. In the present case, the testimony of witnesses fully proves the trust which the answer manifests, and if Mrs. Jamison were seeking to enforce that trust against James and Charles Dungan and the complainant, the court would doubtless aid her. *A fortiori,* the trust being executed, the court will refuse to interfere with her.

The decree of the Chancellor should be reversed and the bill dismissed.

For reversal—BEASLEY, C. J., DALRIMPLE, DEPUE, DIXON, DODD, GREEN, KNAPP, LILLY, REED, SCUDDER, VAN SYCKEL, WOODHULL.    12.

For affirmance—WALES.